ARKENBURGH and EARLE *vs.* WOOD and others, commissioners of the sinking fund, and the MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK.

Land belonging, originally, to the city of New-York, in fee simple absolute, was leased in perpetuity, at a small rent, to the officers of a religious corporation, for the purposes of a church and church yard, or cemetery, and subject to the condition of forfeiture should the lessees at any time "apply or convert the same to private or secular uses." By an ordinance of the common council, duly passed in 1844, authority was given to the commissioners of the sinking fund "to sell and dispose of all *real estate* belonging to the corporation and not in use for, or *reserved for public purposes.*"

*Held*, 1. That the property leased to the corporation was not in use for *public* purposes, within the meaning of the ordinance; the exception having reference to the parks, squares, court-houses, alms-houses, engine-houses, and other grounds and buildings of that nature, possessing a general city character and devoted to general city uses, other than mere revenue, and not to grounds occupied by a particular denomination of christians for their exclusive and special benefit.

2. That so far as the exception contained in the ordinance was concerned, the commissioners of the sinking fund had authority to sell the property in question.

3. That a contract, made by the commissioners, for the sale and release of the city's interest in the premises was either valid or void; if valid, that there was no *ground* for interference by injunction; and if void, that there was no *occasion* for interference.

4. That as to the trustees of the church, their interest was a vendible title. And the law would intend, until an overt act to the contrary was done, that the purchasers of that title contemplated either a continued devotion of the premises to the purposes of "public worship," as prescribed in the grant, or a regular dispensation from the stipulated observance, to be obtained from the common council.

5. That should the purchasers, treating such dispensation as unnecessary, con-

Arkenburgh *v.* Wood.

vert the premises to secular uses, and thereby incur the forfeiture, the consequence, on that assumption, being, if enforced, a benefit instead of injury, to the tax-payers, would afford no ground of complaint on their behalf, or for an injunction.

The commissioners of the sinking fund, under their general authority to dispose of all the real estate of the city of New York, not in use for public purposes, have no power to release, or to bind the corporation to release, the condition of an ancient grant, requiring the grantees, on pain of forfeiture, to devote forever the premises granted, to religious and not secular uses. Such a diversion of the property from the purposes originally contemplated, can only be authorized or ratified by a resolution of the common council, duly passed by both boards, in one and the same year.

No corporator or tax-payer, individually, or on behalf of himself and all others, can sue for an injury to, or a misapplication of, the corporate property or franchises, except in cases of fraud, corruption, or violation of law on the part of the functionaries intrusted with the corporate powers and duties.

THIS suit was brought to test the validity of the sale of the plot of ground on which the edifice commonly known as the Brick Church stands. It was instituted, not by the corporation of the city, but by individual citizens, on behalf of themselves and all other tax-payers, against the corporation and the commissioners of the sinking fund. The plaintiffs alleged that the consideration to be paid to the city, on the sale complained of, was far below the real value of the city's reserved rights in the premises, and that the mode of disposing of those rights, although nominally by public auction, as required by law, was really in consequence of a previous adjustment of the proportionate shares of the city and the church, by private bargain; and that the consummation of the arrangement would be a great sacrifice of the public property, entailing a corresponding increase of individual taxation, and ought therefore, by way of preventive remedy, to be perpetually enjoined, according to the prayer of the complaint. To this complaint, the commissioners of the sinking fund and the corporation of the city, the only parties named as defendants, interposed a demurrer, on the ground, among others, that admitting all the allegations made in the complaint to be true, the plaintiffs had no right, in this action, to the decree which they asked for.

ROOSEVELT, J.   The ground in question belonged originally to the city in fee simple absolute, and was leased in perpetuity, at a small rent, to the officers of the corporation. for the purposes of a church, and church-yard or cemetery, and subject to the condition of forfeiture should the parties at any time " apply or convert the same to private, or secular uses." Under such a lease in fee, two rights, it will be seen, were reserved to the city : one a right to re-enter for non-payment of rent ; the other, a right to re-enter for breach of condition.   And the question— one at least of the questions—is, what is the legal character of these reserved rights, and who has the legal power to dispose of them, and in what manner ?

By the city ordinance, duly passed in 1844, authority was given to the commissioners of the sinking fund " to sell and dispose of all *real estate* belonging to the corporation, and not in use for, or reserved for public purposes." That the brick church property was not in use for *public* purposes, within the meaning of the ordinance, has already been decided on the motion made for a preliminary injunction.   The exception, it was held, had reference to the parks, squares, court-houses, alms-houses, engine-houses, penitentiaries, and other grounds and buildings of that nature, having a general city character and devoted to general city uses other than mere revenue, and not to grounds occupied by a particular denomination of Christians, for their exclusive and special benefit, and in which no other denomination, nor other congregation of the same denomination, could participate.   Such a limited and partial appropriation, it was held, was not a reservation for public use.   The purpose was to advance the interests of the " First Presbyterian Church"—a purpose which, however laudable, was not a " public purpose," within the meaning of the law in this country, where the union of church and state, under its present form of government, is in effect prohibited.   If this view of the meaning of the words " reserved for public purposes" be correct, then so far as the exception contained in the ordinance is concerned, the commissioners had authority to sell, and the first difficulty in the case is removed.

The next difficulty arises out of the suggestion that the prop-

Arkenburgh *v*. Wood.

erty in question is the "real estate" of the church, and not of the city. As I understand the law on this subject, it is both. Where a lease in perpetuity is granted, reserving rent, the right to rent issuing out of the land is as much "real estate belonging to the lessor," as the right to the occupancy of the land itself, is "real estate belonging to the lessee." And it descends to heirs and may be sold and conveyed to purchasers in the same manner. (1 *R. S.* 748.) There is besides a peculiar fitness in placing such a species of property at the disposal of the commissioners of the sinking fund to pay the city debts. It is an interest which can be readily estimated and has no other than a pecuniary value. It may well, therefore, be comprehended in a power to sell "all the real estate belonging to the city not reserved for public purposes." But the right to require that the land granted should be devoted to church purposes, and to re-enter in case of breach of the condition, it may well be argued, stands upon a different footing. The grant, it must be remembered, was made under the colonial system. Its date is ten years prior to the declaration of independence. And its language, therefore, must be interpreted by the rules of law and public policy which then prevailed. Under those rules it was competent to the then city government, "the worshipful, the mayor, aldermen and commonalty," to make a grant to "the English Presbyterian Church, of the city of New York, according to the Westminster confession of faith, catechism and directory, and agreeable to the then Church of Scotland," and to require, as a condition of its continuance, that the property, although granted "forever," should not at any time be "converted to private, secular uses," on pain of forfeiture. The British constitution in 1766 was, as it is still, a union of church and state. It recognized the principle of special privileges, both secular and ecclesiastical—a principle which continued in full force until the revolution, or until the adoption of the state constitution in 1777, abolishing, from that time forth, "all discrimination or preference in religious profession and worship."

Bearing this fact in mind, we are to inquire what was the meaning of an inhibition against "private secular uses," in a

city grant made in 1766? For that purpose the whole instrument, and the prior and attending circumstances, must be taken together. From these it appears clearly that the object of the petitioners in asking, and the meaning of the city corporation in making, the grant, was, that the plot of ground in question should be devoted to the erection of " an edifice or church, (with its accompanying cemetery,) for the public worship of Almighty God," and that it should be applied, on pain of forfeiture, to no other use, all other uses being designated as " private secular uses," inconsistent with the scope and intent of the grant. The expression " private secular" was not used as contradistinguished from public secular. The prohibition, in which it occurs, was merely a negative mode of reiterating the direct purpose of the grant, which, as already stated, was the public worship of the Supreme Being, and not a public " secular" use, however beneficial. Any " appropriation, application or conversion," therefore, of the premises to worldly objects, without the consent of the grantors or their successors, the present corporation of the city, would, by the terms and spirit of the instrument, at the option of the city government, work a forfeiture, and authorize a re-entry reinstating the grantors in their original estate. The question then arises, have the corporation given any consent waiving this condition of the grant? None is set up in the pleadings, and the demurrer admits that none was given. And if I were allowed to look into the affidavits, read on a former motion, it would appear that, although a resolution to that effect was passed by both boards of the common council, yet, having been adopted by one board in one year, and concurred in by the other board in a subsequent year, it was void, as contrary to the city charter.

Should it be said that the corporation had assented to the waiver by the act of their agents the commissioners of the sinking fund, the answer must be that a power to sell the " real estate" of the city, and to sell it only for financial purposes, (the limit of the commissioners' authority) is not a power to release a condition not pecuniary, attached to real estate already disposed of, and disposed of subject to such condition and with an express

Arkenburgh *v.* Wood.

view to religious and not pecuniary uses.  And if the commissioners had no power without a special resolution of the common council, to release the condition and defeat the leading object of the grant, how could they dispose of the right of re-entry which had been reserved solely as the means of enforcing compliance?  As to the rent reserved, that of course was a mere matter of pounds, sterling or currency.  Being reserved too in perpetuity, it was what the law denominates a hereditament.  This rent therefore was real estate, subject as such to the disposal of the commissioners for the benefit of the sinking fund.  But does the right to sell the pecuniary rent necessarily carry with it the right to waive the religious condition?  Upon further reflection, since the argument of the motion for a preliminary injunction, I am inclined to think it does not.  The sinking fund ordinance was a delegation of power to be construed reasonably to effectuate, and not to transcend, the intent.  Its object was to raise money and to pay debts.  No person reading it would suppose its authors had the subject of religious worship in view, or contemplated giving or surrendering any authority in such matters.  Yet the commissioners, in the advertisement of sale signed by them, stipulate that " the corporation will execute a release of all conditions in said grant," as well as of " all their estate, right, title and interest in the premises."

Admitting, however, that the commissioners had no power to release such a condition, or to bind the corporation to do it, their act would be simply void, and any conveyance founded on it, unless sanctioned by an express resolution of the common council, would be a nullity.  Why then, issue an injunction?  The taxpayers will suffer no injury by the sale.  All the loss, if any, will fall upon the purchasers.  It is not pretended that the common council contemplate ratifying the void act (if it be void) of the commissioners.  On the contrary, the averments in the complaint would seem to imply that they repudiate the transaction.  What occasion then for the intervention of the tax-payers?  The right to sue, in their names, does not extend to every case or to cases generally.  Ordinarily, the remedy is in the corporate body and not in the individual corporators.  To justify a

departure from the usual mode of proceeding, the tax-payer must show an unlawful act to his prejudice, done or threatened by the corporation itself, or fraudulently connived at by them. If the act involves an injury to the city treasury, and a consequent increase of taxation, it is for the corporation in the first instance, as the representatives by law of all the tax-payers, to take the proper steps to obtain redress, or to prevent the threatened mischief. Should the corporation illegally or corruptly fail to do its duty, which is not to be presumed without proof, certainly not without averment, it will be time enough then for the constituent to interpose. On the case stated in the complaint there is no occasion for any exceptional mode of procedure; and for that reason alone, were there no other, the suit would have to be dismissed.

Not only, however, are the wrong parties brought in, as plaintiffs, but the right parties are left out as defendants. The purchasers, it is obvious, have a claim to be heard, in any view of the controversy; whereas the tax-payers individually on the case as it stands, or rather as is represented by themselves, have no such claim. Either objection is fatal. The code, § 144, enumerates among the grounds of demurrer demanding a dismissal of the complaint, a want in the plaintiff of " legal capacity to sue," or a " defect of parties plaintiff or defendant.'

Supposing, however, that the proceeding were amended, and that it stood now as a suit by the proper parties, and against the proper parties, and liable to no objection of form, what, on that assumption, would be the proper determination of the questions involved?

*First.* Was the resolution which passed the respective boards of the city government of two different years, purporting to release the condition contained in the grant of their predecessors to the church, an act of the common council, within the meaning of the amended charter of the city?

*Second.* If a resolution so passed was not an act of the common council, (and such is the decision of the general term,) was the general power which the corporation had regularly delegated to the commissioners by the sinking fund ordinance, to sell and dispose of all the real estate of the city not in use for public

*Arkenburgh v. Wood.*

purposes, sufficiently extensive to enable the commissioners alone, without a special resolution of the common council, to execute a release of a condition, valid certainly at the time it was imposed, in favor of "public worship" and the promotion of the Christian religion?

*Third.* And if the sinking fund ordinance contained no such delegation of power, (and it appears to me it did not,) and if, as a necessary consequence, the release of the commissioners, whether in their own name or that of the corporation, must be void, would there still be any sufficient ground for a decree to prevent the delivery, nevertheless, of a deed in execution of the unauthorized contract of sale?

The deed, so far as it might purport to release the condition, would, if the views above expressed are correct, be a mere nullity; and if the purchasers, relying upon it, should buy and pay for the land with an *intent*, contrary to the condition, to apply it to secular uses, no wrong as yet would be done, until the intent should be followed, as it might never be, by an actual conversion to the prohibited uses without first obtaining the consent of the common council. Such a "conversion" in fact, by the terms of the original grant, would alone work a forfeiture. Mere intent is no breach of the condition. And if it were, the only consequence would be a re-entry as provided in the grant—a consequence which, in the altered circumstances of that portion of the city, instead of prejudicing, would be highly beneficial to the tax-payers. Why then should the extraordinary jurisdiction of the court be invoked on their behalf to prevent it? An injunction, whether preliminary or final, presupposes an "injury," or "a threatened *injury* or violation of the plaintiff's rights." (*Code*, § 219.) An injunction issued at the instance of a plaintiff to prevent a threatened *benefit*, would certainly be a judicial novelty; and its being in the form of a final decree, instead of an interlocutory order, would not make it less repugnant to both principle and precedent. But the plaintiffs ask an injunction against "the mayor, aldermen and commonalty," as well as the commissioners, and yet they aver in effect in their complaint that the corporation have done nothing wrong themselves, and

nothing to warrant any wrong of the commissioners. Nor is any contemplated wrong alleged against them. Why, then, should the corporation be impleaded and subjected to the costs of an action? The corporation, besides, in the exercise of an honest and *bona fide* discretion, (and no corrupt motives are charged,) have the legal right, should the public interests in their judgment demand it, to dispense for the future with the disputed condition. Such a dispensation, indeed, it appears was applied for, and was supposed to have been obtained. And if the resolution passed for that purpose was, as has been adjudged, void for want of conformity in the mode of its adoption, with the principles of the new charter, another and valid one, if proper, can no doubt be obtained. At all events, Mr. James and his associates have fairly purchased the title of the *church*, and, as " their assigns," in the language of the grant, have full power and authority to convert the premises to whatever uses the grant may warrant. And as to the officers of the church, the only deed, which by the terms of sale set forth in the complaint, *they* undertook to give, was, " a deed in conformity to the original grant of the corporation," and subject, therefore, of course to the condition, unless duly released, of applying the premises only to the use of a church and church-yard. It may be said that Mr. James and his associates *contemplate* diverting the property to secular uses, and that *they* should be enjoined, by way of preventive remedy, from carrying out their prohibited design. But Mr. James and his associate purchasers are not parties to the suit; and if they were, the grant, as already suggested, provides a different and the only remedy for such a case, and one, as matters now stand, far more beneficial to the tax-payers—a retrocession of the property to the city, by operation of law. " It shall and may be lawful, (says the grant, in the event referred to,) for the mayor, aldermen and commonalty of the city of New York and their successors and assigns into all and singular the aforesaid premises with the appurtenances to re-enter and to hold the same to them and their successors as of their former estate, any thing in the grant contained to the contrary notwithstanding." Neither the officers of the church, therefore, nor the purchasers from

Arkenburgh *v.* Wood.

the church, can be compelled by injunction to devote the premises to public worship. They have a right by contract to elect if they see fit (which they are not very likely to do) to submit to the prescribed forfeiture—a forfeiture of which the common council may or may not avail themselves, and which if enforced, would, according to the statement in the complaint, be a benefit, instead of an injury, to the tax-payers, to the extent of "Four hundred thousand dollars and upwards," that being, as the plaintiffs allege, "the real value" of the property to be forfeited.

In every view of the case, therefore, whether the court confines itself technically to the statements in the complaint, or looks beyond, to facts presented on the former motion, there is no ground for this action either in its present shape or in any other into which it could be transformed by the usual leave to amend. The complaint consequently can only be dismissed with costs.

To prevent any misapprehension, I have made out the following summary of the principal points of the decision :

*First.* So far as the acts of the commissioners are concerned, either the contract made by them for the sale and release of the city's interest in the premises, was authorized by law or it was not ; in other words, it was either valid or void. If valid there is no *ground* for interference—if void there is no *occasion* for interference.

*Second.* As to the trustees of the church, *their* interest (an estate in fee, although subject to rents and conditions) was, in its nature, as well as from the use of the term "assigns" in the grant, a vendible title. And the law will intend, until an overt act to the contrary is done, that the purchasers of that title contemplate either a continued devotion of the premises to the purposes of "public worship," as prescribed in the grant, or a regular dispensation from the stipulated observance, to be obtained, in a proper manner, from the common council of the city, and upon such terms as that body, in the exercise of the discretion reposed in them by the charter, may deem just alike to their constituents and to the purchasers.

*Third.* Or should the purchasers, treating such dispensation as unnecessary, convert the premises immediately to secular

uses, and thereby, if such be the true law of the case, incur the forfeiture provided for in the grant, the consequence, on that assumption being, if enforced, a great benefit instead of injury to the tax-payers, will afford no ground on their behalf for complaint, and of course none for an injunction to anticipate its occurrence.

*Fourth.* The commissioners of the sinking fund, it would seem, under their general authority to dispose of all real estate of the city not in use for public purposes, have no power to release, or to bind the corporation to release, the condition of an ancient grant requiring the grantees, on pain of forfeiture, to devote forever the premises granted to religious and not secular uses. Such a diversion of the property from the purposes originally contemplated, can alone be authorized or ratified by a resolution of the common council, duly passed by both boards in one and the same year, according to the present charter.

*Fifth.* No corporator or tax-payer, individually, or on behalf of himself and all others, can sue for an injury to, or a misapplication of, the corporate property or franchises, except in cases of fraud, corruption, or violation of law on the part of the functionaries intrusted with the corporate powers and duties.

Complaint dismissed, with costs.

[New York Special Term, December 22, 1856. *Roosevelt*, Justice.]